On the evening of June 7, 1976, appellant shot and killed his mother in the kitchen of the home where she was residing. The death weapon was a 22 bolt action rifle which belonged to his father. Appellant was convicted of murder in the first degree and the jury fixed his punishment at life imprisonment in the penitentiary. Throughout the trial proceedings appellant was represented by counsel from the Public Defender's Office in Tuscaloosa and at arraignment pleaded not guilty and not guilty by reason of insanity. After sentence was imposed appellant gave notice of appeal and was furnished a free transcript. Trial counsel was appointed to represent him on appeal.
The facts leading up to and culminating in the death of appellant's mother are not in dispute. After appellant was arrested he was given the Miranda rights and warnings and signed a waiver of rights form. He then gave the officers a confessory statement.
From the record:
 "Q. All right, sir, and did he make any statements concerning that?
"A. Yes, he did.
 "Q. I would like to show you State's Exhibit marked No. Fourteen and ask if you can identify that, please.
"A. Yes, sir.
"Q. What would that be, please?
 "A. This is the handwritten statement taken by Chief Miller. He actually wrote it in my presence from the defendant.
 "Q. And this is the statement we have been discussing, is that right?
"A. That is correct.
 "Q. I note that the name, Mack Davis, appears in the left hand margin of this statement. Would that be the signature of the defendant?
"A. Yes, sir, it is.
"Q. And was that made by him?
"A. Yes, sir.
 "Q. All right, sir, was it made at the time of the writing after the statement was made?
 "A. This was made after the statement was written, after it had been read back to Mr. Davis and after Mr. Davis had read the statement himself and he placed his signature on each page and at the bottom of the last page.
 "Q. All right, sir, now, Officer Fields, I would like for you to state at this time what the defendant stated to you and Chief Miller.
 "A. He stated, `I got up to go to work. I didn't feel like working, then I went back to bed and stayed until about Ten A.M., then sat up again. I had a couple *Page 336 
of dollar bills; about eleven o'clock I drove to Fleetwood grocery and got a carton of beer. I got home again about noon. Mama got a beer and I drank one. I opened another beer and laid down on my bed and turned the radio on. I rested for one-half to one hour. Mother was in the kitchen cooking. I got up to get another can of beer. There was a twenty-two caliber rifle at the head of Mama's bed. The shells was at the head of the bed. I put one shell in the gun and walked to the door of the kitchen. She was standing at the front of stove at refrigerator. She wasn't saying nothing. She was fixing supper, lettuce, radishes, I don't know why I shot Mama. After I shot her I reloaded the gun. She fell on her side or back. Her head was next to the electric stove. Then I felt of her pulse and then I said, screamed and said, oh Lord. When I put another shell in the rifle I walked back into my room but that time I stuck the gun to my head, I wanted to kill myself but I couldn't, then I laid the rifle on the bed, then I went back into the kitchen and felt of her pulse, then I got another can of Budweiser beer out of the refrigerator.'
"Q. He stated he did this after he felt of her pulse?
"A. That is correct, yes, sir.
"Q. All right, go ahead.
 "A. `At that time I left the house and got into my car, and drove to my sister's house. Her name is Bert. She lives near Mr. W.C. Hyche, got out of the car and went in the house and told Bert to go up to Mama's house and check on her. I told her that I thought I shot her. I told her to call the law. Bert left her house at that time. She told me to stay there. I stayed in the house in the middle door. And the law came in about thirty to forty minutes. When the officer came I got into —'
"Q. This is Chief Miller, right?
 "A. This is Chief Miller, right. Going back over that sentence, `When the officer came I got into, in the back seat, he handcuffed me. We stopped one time so I could be excused. My mother wasn't fussing at the time I shot her. I don't know why I shot her. She would hide my beer for herself. I got on to her for opening my beer and setting it around the house.'"
Appellant was intoxicated at the time he shot his mother and according to the members of his family he had a drinking problem that existed for years. He often got mad with his mother because she would not give him "whiskey money." He threatened to kill his mother in the presence of witnesses on numerous occasions. After the shooting appellant got in his truck and drove to his sister's house and told her he had shot their mother and to call the ambulance and the police.
There was other evidence that he was gainfully employed but he did not work the week preceding the shooting. There was some testimony that appellant and his mother were on friendly terms except when he was drinking and when he was drinking he physically abused her.
The sole and only issue presented on this appeal is whether the trial court erred in failing to hold a hearing to determine appellant's competency to stand trial on the representation of his attorney "that he does not remember any of the events surrounding the alleged offense of his shooting his mother and is therefore unable to assist his counsel in the defense of his case."
After appellant was indicted he was committed to Bryce Hospital on two occasions for examination and evaluation. Appellant's counsel introduced into evidence the medical records covering these two commitments.
On July 22, 1976, the Forensic Evaluation Board made the following finding:
 "Mr. Davis' case was reviewed by the Forensic Evaluation Board on this date. It is the opinion of the Board that Mr. Davis has an adequate understanding of the nature of the charges against him and can communicate with his attorney in the preparation of his defense." *Page 337 
On February 4, 1977, the Lunacy Commission filed the following report:
 "We examined Mr. Davis on January 28, 1977, in a Lunacy Commission. This examination indicated a Personality Disorder with chronic alcohol abuse of many years duration including the time of the alleged offense. It is our opinion that the accused was aware of the nature and quality of the act he is accused of and aware of the right and wrong aspects of the situation, and he does not have such a mental disease which would affect his criminal responsibility at the time of the alleged offense."
This Lunacy report was signed by Harold W. Heller, Ed.D. Superintendent, Thomas L. Smith, M.D. Psychiatrist, and Joseph D. Woddail, M.D. Psychiatrist.
On March 1, 1977, Dr. Thomas L. Smith, M.D. Psychiatrist, a member of the Lunacy Commission, filed the following report:
"MENTAL STATUS EXAM
 "Include: Physical appearance and behavior during interview, affect and mood, speech (coherent, flight of ideas, blocking, etc.), train of thought, content of thought, orientation, memory and intellectual capacity, and patient's idea of why he is in the hospital.
 "Name: Davis, James Mack "File: 03 65 77 "Unit: Forensic Ward: 23W "Date of Birth: 1-17-35 Sex: M "Date: March 1, 1977
 "Narrative Summary: This forty-two year old divorced, White male was committed here from Tuscaloosa County Circuit Court charged with murder of his mother. He has a seventh grade education. Background reveals considerable alcohol abuse with chronic alcoholism in the history. He has been arrested many times on alcohol related charges. He has many fugue states. His sister reports that he was always a different acting member of the family. His current idea of what has happened is that he says `they say I tried to kill myself and that I killed my mother.' He reports heavy drinking and alcohol abuse in the weeks preceding his mother's death and that he was `half drunk and nervous at the time.' He has had toxic type hallucinations involving the abuse of the alcohol.
 "Mental Status Examination reveals a well-groomed, relaxed, friendly, White male of apparent stated age who speaks spontaneously without loosening of associations. His affect is within normal limits. His content is negative for delusions or hallucinations. Reality testing appears adequate. His ability to abstract thought is somewhat impaired. Sensorium appears clear. His judgment and insight are fair to good.
 "DIAGNOSIS: 303.2 Alcohol Addiction "Competency Statement: This individual appears competent to cooperate in his defense and understands the nature and quality of the acts charged and is judged competent to stand trial.
 "Responsibility Statement: This individual appears to have been mentally responsible for his actions at the time of the alleged offense and has no mental disease which would tend to excuse him from such responsibility. He appears to understand the nature and quality of the act charged and the rightfulness and wrongfulness involved as well.
 "/s/ Thomas L. Smith, M.D. "Thomas L. Smith, M.D. "Psychiatrist "/dmm "Date Dictated: 3-1-77 "Date Typed: 3-10-77"
The trial of this case began on April 27, 1977. Before the presentation of any evidence appellant's counsel objected to the trial proceeding stating that appellant was incompetent to stand trial. Counsel told the Court that appellant remembered nothing of the events surrounding the offense and was unable to assist in his defense. The trial court overruled the objection.
During the course of the trial appellant took the stand on voir dire examination concerning the voluntariness of the confessory statement which he made to the investigating *Page 338 
officers. In this statement appellant admitted killing his mother. During voir dire appellant repeatedly denied having any recollection of signing the confessory statement or the waiver of rights form though he admitted his signature was on each document.
Insanity is an affirmative defense and puts a statutory burden upon the defendant to clearly prove to the reasonable satisfaction of the jury that he was so afflicted by disease of the brain when the offense was committed as to render him so insane that he did not know right from wrong with respect to the particular offense charged, or by reason of such mental disease he could not resist doing the wrong; and the crime must have been the product solely of such mentally diseased condition. Lokos v. State, 278 Ala. 586, 179 So.2d 714; Knightv. State, 273 Ala. 480, 142 So.2d 899.
Appellant called Dr. Jerold S. Lower, a psychologist, as a witness in attempting to support his insanity plea. This witness performed the initial interview with appellant upon his first entry into Bryce in July, 1976. Based upon his interview Dr. Lower concluded that appellant was depressed, his contact with reality was poor, and he was somewhat retarded. Dr. Lower was of the opinion that appellant was probably psychotic at the time of that interview.
On cross-examination this witness testified that the reports of both Dr. Thomas L. Smith and Dr. Joseph Woddail, Psychiatrists, revealed that appellant was sane and criminally responsible for his acts.
It is fundamental that to try an accused while he is incompetent violates due process. Bishop v. United States,350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835. Pate v. Robinson,383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815; Drope v. Missouri,420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103.
If the accused has presented any evidence to the trial court, before or during the trial, that raises a "bona fide doubt" of his competence, the trial court's failure to make further inquiry denies him a fair trial. When sufficient doubt as to an accused's present competency exists, a judicial hearing to determine his competency to stand trial is mandatory. Pierce v.State, 292 Ala. 745, 293 So.2d 489.
In Davis v. State of Alabama, 545 F.2d 460, 5 Cir., it is stated:
 "Obviously, one cannot fault a trial court judge for failing to determine a question that he has no reason to believe is an issue."
And,
 "Essential to a claim that the trial court violated one's procedural due process rights, pursuant to Pate's mandate, by not determining competence at the time of trial is a showing that the defendant presented evidence raising the issue of competency."
Absent any evidence raising the issue of competency to stand trial a trial judge is not required to suspend the proceedings and conduct a competency hearing. Barfield v. State,54 Ala. App. 15, 304 So.2d 257; Billups v. State, Ala.Crim.App.,338 So.2d 478.
Three factors are to be considered by the trial court in evaluating an accused's competency to stand trial, (1) the existence of a history of irrational behavior, (2) prior medical opinion, and (3) accused's demeanor at trial. Drope, supra; Davis, supra.
In this case there was absolutely no history of irrational behavior and no prior medical opinion. As we have stated appellant testified on voir dire and the trial judge observed him and heard his testimony. The record is not silent as to appellant's demeanor at trial. The fact that appellant's counsel stated to the Court that he could not recall the events leading up to the killing simply does not meet the test of competency to stand trial. This does not constitute evidence.
As to appellant's demeanor at trial it can be reasonably inferred that he was aware of the nature of the proceedings. When the trial court explained appellant's right to have the jury sequestered the record shows the following: *Page 339 
 "MR. BURROUGHS: Let the record reflect that I, Ralph Burroughs, attorney for the defendant, explained his rights to him concerning sequestering the jury and I am satisfied he fully understands his rights and he is waiving that right and does not insist that the jury be kept together, is that right, Mr. Davis?
"MR. DAVIS: Yes, sir."
It thus appears that appellant's sole ground on which he claims he was incompetent to stand trial was that he had a loss of memory surrounding the facts on the night he killed his mother. If this claim constitutes incompetency to stand trial then it is a question of first impression in this state.
In Jackson v. State, 548 S.W.2d 685, the Court of Criminal Appeals of Texas, in treating a similar issue, said:
 "The question before us is whether an accused's loss of memory regarding the facts of the event for which he is charged, standing alone, renders him incompetent to stand trial as a matter of law. We find the question to be one of first impression for this Court, but find that there is a growing body of outside authority addressed to the question here presented. We find no case yet reported which has held that the inability to recall the event charged because of amnesia constitutes mental incapacity to stand trial. See Amnesia: A Case Study in the Limits of Particular Justice, 71 Yale L.J. 109 (1961, 1962); United States ex rel. Parson v. Anderson, 481 F.2d 94
(3rd Cir. 1973); United States v. Sullivan, 406 F.2d 180 (2nd Cir. 1969); United States v. Stevens, 461 F.2d 317 (7th Cir. 1972); State v. Ferguson, 26 Ariz. App. 285, 547 P.2d 1085 (1976); Bradley v. Preston, 263 F. Supp. 283 (D.C.Colo. 1967), cert. den. 390 U.S. 990, 88 S.Ct. 1188, 19 L.Ed.2d 1296; United States v. Stubblefield, 325 F. Supp. 485
(D.C.Tenn. 1971); People v. Francabandera, 33 N.Y.2d 429, 354 N.Y.S.2d 609, 310 N.E.2d 292 (1974); State v. Severns, 184 Kan. 213, 336 P.2d 447 (1959); State v. Swails, 223 La. 751, 66 So.2d 796 (1953); . . ."
* * * * * *
 "In State v. Pugh, 117 N.J. Super. 26, 283 A.2d 537
(1971), a murder case, the court held that amnesia of the crime does not bar prosecution because, even if the defendant has forgotten the details of the crime, he is still competent to stand trial. The court explained that amnesia concerning the crime `does not render a defendant unable to comprehend his position or to consult intelligently with counsel in the preparation of his defense.' "In Fajeriak v. State, 520 P.2d 795 (Alaska 1974), the Alaska Supreme Court held that the loss of memory did not render one incompetent and that:
 `Policy conjoins with precedent to oppose an expansion of the doctrine of incompetency to include amnesia. The potential for fraudulent allegations of memory loss is so great that we would for this reason alone be reluctant to follow amnesia as a ground for a finding of incompetency even if we were otherwise inclined to do so.'"
Even if appellant did not in fact remember the details of the crime, he would still be competent to stand trial. Amnesia
concerning the crime does not bar prosecution. A contrary rule would unduly hamper the State's interest in the prosecution of violators of its criminal laws and jeopardize the safety and security of other citizens. We here and now reject the notion that amnesia, standing alone and absent the three factors above mentioned, constitutes incompetency to stand trial. We prefer to follow the pronouncements in Jackson, Pugh, and Fajeriak, supra.
We have carefully examined the record for errors injuriously affecting the substantial rights of appellant and have found none. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur. *Page 340